#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**,

        v.

**SAMUEL RIVERA-RODRIGUEZ,**
    Defendant.

Criminal No. 16-086 (CCC/BJM)

#### REPORT AND RECOMMENDATION

In June 2015, agents from the Puerto Rico Police Department ("PRPD"), working for the Puerto Rico Violent Offender Task Force ("Task Force") in conjunction with the United States Marshals Service ("USMS"), executed a search warrant at a residence in Ponce utilized by Samuel Rivera-Rodriguez ("Rivera"). Dkt. 36-2, Affidavit. The agents found and seized contraband and arrested Rivera in the home. Dkt. 36 at 7. Rivera stands charged with multiple controlled substances and firearms offenses. Dkt. 26. Rivera moved for a *Franks* hearing and suppression of the fruits of the search at the Ponce residence. Dkt. 36. The government opposed. Dkt. 40. This matter was referred to me for a hearing and a report and recommendation. Dkt. 37. Suppression hearings were held on August 13, October 2, and November 2, 2018. Dkts. 107, 109, 115. Transcripts were produced. Dkts. 116, 118. The parties submitted post-hearing briefs. Dkts. 120, 121.

For the reasons set forth below, the motion to suppress should be **DENIED**.

#### BACKGROUND[1]

On June 19, 2015, Task Force agents executed a search warrant, Dkt. 36-1, at Rivera's residence in Ponce and seized contraband. The agents also arrested Rivera, who was in the home at the time and had a warrant out for his arrest as a federal fugitive. *Id.* The District Court of Puerto Rico issued the warrant upon the request of Deputy United

---

[1] The facts are drawn from testimony at the suppression hearings and, where indicated, factual statements from the parties.

States Marshal Anthony D. Lopez ("Lopez"), who worked with the Task Force.[2] In support of the request, Lopez submitted an affidavit. Dkt. 36-1, Ex. A ("Aff."). Rivera alleges that two material misstatements and six material omissions in the affidavit indicate falsity or reckless disregard for the truth such that the search warrant based on it must be voided. Dkt. 36 at 11–12.

In the morning on June 17, 2015, an unidentified confidential source informed the USMS that Rivera was at Calle Katy in the Borinquen Ward in Guayama, Puerto Rico. Prior to the tip, Lopez did not know the source, but he trusted the information. Lopez already knew that the suspect as from the Borinquen Ward and relied on the word of his fellow officers who passed it along to him.

Task Force agents began planning an arrest operation to capture Rivera. Lopez ran the operation. As part of their preparation, members of the Task Force unit saw photos of Rivera and his tattoos and were briefed on techniques that he had used to evade the police before.  PRPD Officer Adalberto Cordero Ramos ("Cordero"), PRPD Officer Jose Alberto Orellano Navarro ("Orellano"), and PRPD Officer Alex Ortiz Cartagena ("Ortiz") were assigned to the Task Force and attended the briefing. Cordero recognized Rivera from a "wanted"-style board in the office. Ex. A-3. The photos depicted Rivera's chest, back, and right arm tattoos. Exs. A-1, A-2, A-3. Orellano noted that, in his experience, tattoos were common in Puerto Rico but tattoos that covered half of a person's torso or a person's entire back, like Rivera's, were rare. Ortiz had interacted with Rivera before, in the early 2000s, when assisting in his arrest. Between 2012 and the instant operation, Ortiz participated in five or six searches for Rivera in the Borinquen Ward.

Roughly twenty officers formed the unit that arrived at the Borinquen Ward at nighttime, between 9:00 and 11:00 p.m. Exhibit 7 depicts an aerial view of the Ward.  The

---

[2] Further complicating the timeline and alleged omissions in this case is a discrepancy that neither party appears to have noticed. A federal magistrate judge issued the search warrant on June 18, 2015 at 6:20 p.m., yet Lopez recorded the date and time the warrant was executed as June 18, 2015 at 5:45 p.m. Dkt. 36-1 at 3–4.

unit was eventually directed to the small triangle of land formed where Calle J. Badé Pérez and Calle Cecilio Domínguez meet the end of Calle Katy, which runs parallel to the Guamaní River. It is circled in Exhibit 7. The Task Force unit arrived on Calle Katy, facing residences that abutted the shoreline; they are pictured in Exhibit 6. It was nighttime, but streetlights provided visibility.

At about 12:45 a.m. on June 18, 2015, Orellano walked alone down the alley between two residences. He used the flashlight attached to his rifle for light. The houses were separated by a cyclone fence, about chest-high, which ran perpendicular to the zinc, backyard fence of the yellow house. The cyclone fence separated Orellano from the yellow house's side- and backyards, which were to his left. Ex. 6. Orellano observed a dark object fly past him. Orellano turned, saw the suspect climbing the zinc backyard fence about ten feet away, [3] and began to shout at him to stop. The suspect paused for a moment and looked at Orellano. The suspect wore dark shorts and no shirt. Orellano testified that he was certain the man was Rivera: he could see his tattoos on his back and chest that matched the photos, and he recognized Rivera's face. Orellano did not see a weapon.

Orellano's shouts attracted attention. Lopez, still exiting his car, could hear Orellano shouting commands and exclaiming that "Sammy" was running out of the back of the house. Ortiz, nearby, ran into the backyard to join Orellano. He saw the suspect finish climbing the fence and jump over it; from about five to ten feet away, he recognized the suspect as Rivera by the tattoos on his back. The suspect made it safely over the fence in about fifteen seconds. Lopez recalled stopping Orellano to confirm his positive identification and Orellano telling him that the suspect was shirtless. Orellano does not recall talking to Lopez at that moment. The unit fanned out through the neighborhood, searching for the suspect.

---

[3] An FBI interview report from July 2015 later stated that Orellano had been twenty to thirty feet away.

Ortiz jumped into a car, drove two blocks, and turned left in an effort to cut the suspect off. Ortiz gave chase on foot, running down Calle Katy, turning left on Calle Cecilio Domínguez, and left again on Calle Tetuán. At Calle Tetuán, he jumped into Cordero's car and they drove another block to Calle Porrata Doria. The men exited the car and continued on foot down the last block of Calle Tetuán toward the end of the road, which curved to the right and intersected with Calle Bajada La Tuna. Ex. 7. Ortiz, who was familiar with the area, thought the suspect might use the path as an escape route into a wooded area at the end of Calle Bajada La Tuna.

When roughly ten minutes had passed since the initial sighting, Ortiz and Cordero spotted the suspect trying to enter a green house on the southeast corner. Ex. 1. The suspect could not enter, and they saw him walking back and forth in the center of the intersection. A streetlight in front of the green house illuminated the scene. Ex. 1. Cordero testified that he spotted the suspect from a distance about equal to the length of the courtroom and identified him as Rivera. Ortiz recalls being about fifteen feet away, seeing the suspect's face, and identifying him as Rivera. Ortiz and Cordero testified that the suspect wore a cap with a brim, dark shorts, and a light-colored shirt. Cordero, pressed by counsel, stated that the hat did not necessarily cover the suspect's forehead. Neither Ortiz nor Cordero testified that the hat impeded their positive identifications of the suspect as Rivera. They identified themselves as police and ran toward the suspect. The suspect then reached into his waistband, produced a weapon, and began to fire at them. They returned fire. Orellano, located about one hundred and fifty feet south of the intersection, on Calle Bajada La Tuna, observed the interaction. He saw the suspect and identified him as the same man he saw climbing the fence ten minutes prior. He testified that suspect wore a cap with a brim, dark shorts, and a light-colored shirt. The gunfire exchange ended, and the suspect escaped into the wooded area at the end of the street.

Lopez and others arrived at the intersection shortly after hearing the gunfire. As they took control of the scene, there was an explosion-like noise and the street lights went

out. Lopez learned that Ortiz and Cordero had exchanged fire with the suspect but spoke only with Ortiz for a description of the events. Ortiz identified the suspect, and Lopez testified that he described him as wearing a dark shirt and dark shorts. The officers continued to take custody of the scene but did not perform a thorough search of the nearby wooded area until an FBI Aviation team arrived. The officers conducted a search of the area with no results.

Using electronic surveillance, the unit re-located the suspect in Guayama and tracked him to Ponce later that day. Aff. ¶ 5. Ponce is a city about an hour away from the Borinquen Ward. Around 8:00 a.m. on June 18, 2015, the Task Force unit saturated the area. Lopez spoke to a neighbor, who identified the suspect based on a photo and stated that he had arrived earlier that morning. The neighbor did not specify a time. The unit used a public address system to call for the suspect to come outside. There was no response. Officers then approached the home, knocked on the door, and announced their presence. A young woman answered and permitted them to search the home. They did not find the suspect. Officers then showed her a photo of the suspect, and she identified him as a sublettor who rented a room in the back of her home. The officers went to the room, knocked on the door, announced their presence, and arrested the suspect. The suspect had been asleep at the time officers executed the warrant. Lopez identified him and confirmed that the suspect was Rivera. He then prepared an affidavit to obtain a search warrant for the residence.

Lopez, in writing his affidavit, relied in part on information provided by other officers rather than firsthand knowledge. The bare-bones affidavit reads, in part, as follows:

> 2. In the early morning hours of June 18, 2015, members of the U.S. Marshals Service led Puerto Rico Violent Offender Task Force, received information from a confidential source, that fugitive Samuel Rivera-Rodriguez was located at the Boriquen [sic] Ward, Calle Katy, Guayama, PR.
>
> 3. Deputy U.S. Marshals and Task Force Officers attempted to make contact with Samuel Rivera-Rodriguez, when the subject began to flee the scene.

> The subject had no shirt on, making him easily identifiable by the tattoos on his chest and back. The subject was wearing black shorts at the time he began to evade law enforcement.
>
> 4. While being chased by law enforcement, Samuel Rivera-Rodriguez fired bullets from a firearm at sworn Special Deputy U.S. Marshals. The subject was able to evade law enforcement by running into the adjacent woods.
>
> 5. Deputy U.S. Marshals and Task Force Officers were able to re-locate the subject near Road 3, Guayama, PR, Deputy U.S. Marshals and Task Force Officers conducted a surveillance, following the subject to a residence in Ponce, PR.
>
> 6. Based upon the above, your Affiant states that he has probable cause to believe that **Samuel Rivera-Rodriguez** utilizes the residence at Urbanization Jardines del Caribe, 4832 Calle Lanceoda, Ponce, PR to illegally possess a firearm.

Aff. ¶¶ 2–6. The remainder of the affidavit identifies the reason underlying the search for Rivera, a federal probation violation and a state homicide warrant, and Lopez's oath that the stated facts supporting the application for a search warrant are true. *Id.* at ¶¶ 1, 7.

At the suppression hearing, Lopez could not remember if Ortiz mentioned tattoos as a method of identifying the suspect. He was aware of accounts in which the suspect wore a t-shirt but not a cap. Lopez stated that he was confident in Orellano's account that the suspect was shirtless and in Ortiz's account that the suspect wore a shirt, and he did not think it was important to clarify the point. Lopez acknowledged that the phrase "early morning" is vague and "followed" implies physical following even though the Task Force employed electronic surveillance to track the suspect to Ponce.

### DISCUSSION

Pursuant to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause is a fluid standard measured by whether the totality of the circumstances support a reasonable person's belief that a crime has been or is being committed. *See Illinois v. Gates*, 462 U.S.

213, 235 (1983); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). The affidavit describing the place to be searched and items to be seized must give the issuing magistrate a substantial basis to conclude that probable cause exists. *Gates*, 462 U.S. at 239. An "affidavit supporting a search warrant is presumptively valid," *United States* v. *Gifford*, 727 F.3d 92, 98 (1st Cir. 2013), but a "defendant may attempt to rebut this presumption and challenge the veracity of the affidavit." *United States* v. *McLellan*, 792 F.3d 200, 208 (1st Cir.), *cert. denied*, 136 S. Ct. 494 (2015). The Supreme Court established the mechanism for doing so in *Franks* v. *Delaware*, 438 U.S. 154 (1978).

A defendant may overcome the presumption of validity and obtain an evidentiary hearing, or *Franks* hearing, if he can make a "substantial preliminary showing" both "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth" and that the "falsehood or omission [was] necessary to the finding of probable cause." *McLellan*, 792 F.3d at 208. This is a heavy burden. To satisfy the first prong, the defendant must make more than conclusory allegations; he must prove knowledge or reckless disregard by a preponderance of the evidence. *See Franks*, 438 U.S. at 171; *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015). To satisfy the second prong, the defendant must demonstrate that the alleged falsity or material omission was necessary to the judge's finding of probable cause. *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012). If, notwithstanding the alleged falsity there remains probable cause to issue a warrant, then a *Franks* hearing is not required. *Franks*, 438 U.S. at 171–72.

Here, Rivera alleges two material misstatements in and six material omissions from the affidavit. Rivera alleges that the affidavit implies a positive identification of the suspect by the tattoos on his back and chest when officers described him as wearing a shirt and the affidavit implies the Task Force physically tracked the suspect to Ponce when that was not the case. Dkt. 36 at 6–7. The alleged omissions are: 1) the lack of indicia of reliability supporting the confidential source; 2) the description of events as taking place in the "early morning hours" when they took place closer to midnight; 3) the circumstances in which

the agents identified the suspect; the suspect wore a shirt that obscured his tattoos 4); 5); the suspect wore a cap 6) the use of electronic surveillance to find the suspect in Ponce. *See* Dkt. 36 at 5–7.

*Confidential Source*

Rivera contends that the warrant lacks indicia of reliability to support the confidential source's tip. When an affidavit relies on confidential sources, it must provide the issuing magistrate with information to assess the information's credibility. *United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002). This information may include the person's basis of knowledge, whether statements are self-authenticating or were corroborated, and whether the affiant assessed the significance of the information based on his experience or expertise. *Id*. (citing *United States v. Khounsavanh*, 113 F.3d 279, 284 (1st Cir. 1997)). The affidavit includes the fact of the tip only to explain why the unit suspected that Rivera would be in the Borinquen Ward on June 18, 2015. The affiant offered no details about the source's basis for that information or whether he assessed the information and believed it to be significant based on his expertise. *See generally* Aff. The affidavit corroborated the tip, however, because it states that agents identified Rivera on Calle Katy in the Borinquen Ward on June 18.

The government contends that the tip itself serves only an expository function and is immaterial to probable cause. Dkt. 121 at 11. "The material part of the affidavit is the actual identification of the defendant at the Borinquen Ward, not that a confidential source directed them to where the defendant was located." *Id.* The government is substantially correct. Probable cause in this case turns on whether the totality of the circumstances support a reasonable person's belief that the Ponce residence contained firearms and related accessories and dark-colored shorts seen on the suspect during the shootout. Aff. at 11. Unlike the case in *Barnard*, in which the informant tipped police off to firearms inside the suspect's home, here the tip was merely a fugitive suspect's location. The factors employed to measure a source's credibility are fluid; "stronger evidence on one or more factors may

compensate for a weaker or deficient showing on another." *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996). Here, Orellano and Ortiz corroborated the statement by identifying Rivera by his tattoos in the back of the residence. Lopez, in his affidavit, attested to his experience in fugitive investigations, handling sources of information, and conducting surveillance. Aff. at 6. Lopez had prior knowledge that Rivera was from the Borinquen Ward, and searches for him there had taken place in the past. In light of the comparative insignificance of the tip and the strength of the corroborating information, Rivera cannot satisfy the first *Franks* prong.

Even if Rivera could show the affiant recklessly omitted details about the confidential source, he would not be able to satisfy the second prong. The source's reliability did not affect probable cause in this instance but rather affected the probability that the Task Force unit would go to the Borinquen Ward. If the confidential source's basis for personal knowledge or other indicia of reliability had been included in the affidavit, there would still be probable cause.

### *Time of Night*

The affidavit states that the unit went to the Borinquen Ward "[i]n the early morning hours of June 18, 2015" and omits the actual time these events occurred. Dkt. 36 at 13. Rivera alleges the phrase "early morning hours" implies daylight hours when the time was closer to 12:30 a.m. The specific time is relevant because, Rivera contends, the credibility of an identification may be weakened if an issuing magistrate knows it occurred at 12:30 a.m. instead of 7:30 a.m., for example. *See id.* Rivera did not, however, make a substantial preliminary showing that Lopez omitted these facts knowingly or recklessly. *See McLellan*, 792 F.3d at 208. Even if Rivera had done so, however, he would not have been able to meet the second prong of *Franks* because the information elicited at the hearing would have strengthened the probable cause finding.

Witness testimony at the suppression hearing and exhibits resolved doubts about ambient darkness on June 18 around midnight. Each identification occurred in a lit area. In

the backyard, Orellano illuminated the suspect with the flashlight attached to his rifle. The streetlight supplemented the flashlight, and Orellano testified to having clear visibility at all times. Ortiz benefitted from the same lighting when he identified the suspect as Rivera. Exhibit 1 depicts the intersection at which the suspect exchange gunfire with Ortiz and Cordero. Two streetlights, with their bases painted white, are visible. One stands directly in front of the green house which the officers saw the suspect attempt to enter; the second stands nearby. Ex. 1-1. Although the area suffered a blackout later that night, the power remained on during the shootout and enabled Ortiz, Orellano, and Cordero to each identify the suspect as Rivera. Including the precise time of night at which these identifications were made would not reduce probable cause because darkness did not hamper any of the identifications made.

*Circumstances and Distance*

Rivera also argues that, had the affiant included the circumstances in and distance from which the agents made their identifications, it would have had a significant impact on a finding of probable cause. Dkt. 120 at 8–9. Rivera contends that the identification of the suspect could not have been easy because of the darkness, the chase, and the tension inherent in a search for a fugitive. Dkt. 120 at 9. The darkness, as stated, did not play much of a role besides requiring Orellano to use his flashlight and some reliance on streetlights. The identifications were not made during a chase—they were made while officers watched the suspect climb and fence and pace in an intersection. Even if tracking the suspect on June 18 was as tense as Rivera contends, including that detail would not vitiate probable cause. Lopez's affidavit identifies both that a chase and a shootout occurred. This would provide the magistrate with sufficient information to understand that there were tense moments, but such moments do not inherently render an identification more difficult. Calling the identifications "easy" communicates that the identifications occurred in comparatively calm moments in the evening—in the backyard while the suspect did not have a visible weapon and was occupied with climbing a fence and in an intersection before

United States v. Rivera-Rodriguez, Criminal No. 16-086 (CCC/BJM)                                  11

any weapons were produced. A positive identification, not an easy identification, is necessary for probable cause; explicitly highlighting the tense circumstances already implied by "chased" and "fired bullets" would not satisfy the second *Franks* prong because probable cause would remain. *See* Aff. ¶ 4; *Franks*, 438 U.S. at 171–72.

Rivera also raises questions about the omission of the distances from which the officers identified the suspect. In the backyard, Orellano identified the suspect as Rivera from a distance of ten feet and Ortiz from five to ten feet. There was some dispute over whether Orellano was ten feet away or twenty to thirty feet away, a distance recorded in an FBI interview report about that night. There was no dispute over Ortiz's distance, which counterbalances the contention surrounding Orellano's. At the intersection, Ortiz recalled identifying the suspect from fifteen feet, and Cordero remembered a distance of about the length of the courtroom, from behind the bench to the door. Orellano stood about one hundred and fifty feet from the suspect when he identified him in the intersection. Because clear visibility in the backyard is evident, including the distances from which Orellano and Ortiz first identified the suspect as Rivera would likely strengthen the finding of probable cause rather than weaken it.

The identifications at the intersection vary more. Ortiz and Orellano each confirmed that the man they had seen earlier was the same person standing in the intersection. Cordero identified the suspect as Rivera for the first time, but he was also the closest, thus eliminating the uncertainty that might have come with depending solely on Ortiz or Orellano, who were much further away. Including this information would have strengthened probable cause to issue a warrant, especially because there were three close-proximity identifications and two facial identifications.

*Clothing*

Orellano and Ortiz first saw the suspect shirtless and depended, in part, on his tattoos to identify him as Rivera. Later, in the intersection, they and Cordero identified as Rivera a man wearing a shirt and a cap. Rivera contends that the cap and shirt belie the

affidavit's statement that the suspect was "easily identifiable by the tattoos on his chest and back." Dkt. 36-1 at 3 ¶ 3; Dkt. 36 at 7. Rivera makes a compelling point, and Lopez testified that he was not aware of the clothing nor did he recall Orellano mentioning the tattoos as a method of identification. Orellano saw the suspect's face and mentioned his shirtlessness, which might excuse Lopez's assumption. Lopez did know, however, that Ortiz later saw the suspect wearing a shirt at the intersection and identified the suspect as Rivera. The affidavit omits this identification entirely and makes no mention of the clothing change. It also omits the cap that the suspect wore at the intersection. Rivera contends that this misrepresentation and omissions were knowing or reckless and necessary to the finding of probable cause. Dkt. 120 at 9–11.

An omission is reckless "only if it is 'designed to mislead, or . . . made in reckless disregard of whether [it] would mislead'" the issuing magistrate. *United States v. Barbosa*, 896 F.3d 60, 68 (1st Cir. 2018) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). The court may infer recklessness only if the omission was critical to determining probable cause. *Barbosa*, 896 F.3d at 68 (citing *Tanguay*, 787 F.3d at 49). Mere negligence is excused, so the affiant's good faith belief in his statement will not satisfy the *Franks* standard. *Id.* The *Tanguay* court gives as an example a First Circuit case in which an affiant's decision not to include the key witness's recantation was merely negligent "because of the affiant's good faith belief that recantation was incredible." *Tanguay*, 787 F.3d at 49.

Here, Lopez professed confidence in his officer's reports. In addition, the addition of clothing does not disprove the identifications, especially given the roughly ten-minute interlude between the backyard and the intersection, during which time the subject easily could have put on a shirt and cap. Officers still identified the suspect as Rivera based on photos they had seen. The cap did not fully obscure the suspect's face, and its presence would have been as ornamental in the affidavit as it was in the moment. As a result, the omission would not have been critical to finding probable cause. It is important to note at this juncture, however, that the decision not to clarify conflicting stories is dangerous. An

affidavit need not include "every shred of known information," but this flexibility is not permission to rest on assumptions, especially where the accounts could so easily have been verified. *See id.* Even where there is a simple explanation, the public must be able to trust that law enforcement will be diligent in its investigations. The government would be wise to heed this suggestion in the future.

*Surveillance*

Rivera contends that the affidavit implies that the officers physically tracked the suspect to Ponce and that it omits the use of electronic surveillance in a misleading fashion. Dkt. 36 at 7; Dkt. 120 at 5–8. Lopez agreed at the hearing that "following the subject to a residence in Ponce" suggested physical pursuit. *See* Aff. ¶ 5. Rivera contends that the omission and implication of visual surveillance on the suspect misled the magistrate to believe that the suspect involved in the shoot-out was the same person the officers arrested in Ponce. Dkt. 120 at 8. The act of surveillance itself supports probable cause. Omitting the specific type of surveillance does not qualify as reckless where the government has an interest in confidentiality of its investigative techniques, and *Franks* imposes such a weighty burden of proof.

Nor do the facts bear the weight of Rivera's argument that obscuring the type of electronic surveillance could mislead the magistrate into believing that the suspect in the Borinquen Ward and the individual arrested in Ponce were the same person. Dkt. 120 at 8. Clarifying the type of pursuit would not vitiate the finding of probable cause. Furthermore, Lopez testified that he verified the suspect's presence when they arrived in Ponce. A neighbor identified a photograph of Rivera as depicting a man who had entered the residence in Ponce earlier that morning. The young woman who answered the officers' knock on the door likewise identified a photograph of Rivera as the man renting a room from her. In light of officers' prior positive identifications of Rivera in the backyard of the yellow house and in the intersection of the Borinquen Ward, there would still have been probable cause to search the Ponce residence. These omissions regarding surveillance and

confirmation of the suspect's identity would have bolstered probable cause for the search warrant. By mysteriously omitting this information, the government created additional, unnecessary problems for itself.

In the end, Rivera has not demonstrated that any false statements or omissions in the affidavit were made knowingly or in reckless disregard for the truth, or that any such false statements or omissions were necessary for the finding of probable cause.

## CONCLUSION

For the foregoing reasons, the motion to suppress should be **DENIED.**

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas* v. *Arn*, 474 U.S. 140, 155 (1985); *Davet* v. *Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co.* v. *Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden* v. *Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 19th day of December, 2018.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge